IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MOTIVATION INNOVATIONS LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 11-615-SLR |
| | ) |
| ULTA SALON COSMETICS & | ) |
| FRAGRANCE INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM ORDER

At Wilmington this ꝺꝺday of July, 2014, having heard argument on, and having

reviewed the papers submitted in connection with, the parties' proposed claim

construction;

IT IS ORDERED that the disputed claim language of U.S. Patent No. 5,612,527

("the '527 patent") shall be construed consistent with the tenets of claim construction

set forth by the United States Court of Appeals for the Federal Circuit in *Phillips v. AWH

Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), as follows:

**1. "[A] circulation medium:"**[1] "[A]n advertising vehicle that is distributed." The

specification describes the invention as "[a] system for redeeming discount offer flyers

which are mailed, handed or otherwise distributed to potential customers" and "point of

sale redemption of discount offers . . . made using a distributed brochure/flyer medium."

(Abstract; 1:19-22) The specification further describes the "mailed circular brochure or

flyer as "an advertising vehicle." (3:20-21)

**2. "[A]ssociating said identification code with data identifying items which**

---

[1]Claims 1 and 17.

**are to be offered at a discount"[2] / "associating said identification code means . . . with data identifying items to be offered at a discount:"[3]** "[E]ach identification code refers to a data file, which file lists more than one discount eligible item. This does not include a discount applicable to an entire department or store, which does not enumerate specific items." The claim language "any discount corresponding to an item listed in said data" and "if the involved item is listed as part of said data identifying an item as qualifying for a discount as called for by the data base data defined by the identification code of the medium" supports this construction. (9:20-30)

The specification explains that "[t]he code represented by the indicia 42 when read by the system through one of the scanners 6 identifies an address in the memory means 14 which corresponds to a current discount circular." (6:33-35) "The data representing items [and their associated discounts] contained at the memory address corresponding to the particular flyer are called up from memory 14 and are stored in temporary memory . . . ." (7:56-63) Therefore, the identification code "is the numeric machine readable code needed for the computer to identify and access the appropriate location in memory where items offered for discount are stored." (6:59-62) The specification also requires that the data list the specific items offered as a discount, describing that "[a] discount is debited against the purchased item if the involved item is listed as part of the data identifying an item as qualifying for a discount as called for by the identification code of a circulation medium." (4:24-28)

---

[2]Claim 1.

[3]Claim 17.

2

During prosecution, the patentee distinguished his invention from the prior art, arguing that it "fails to recognize a fundamental concept of the subject patent: that a single identification code can provide numerous discounts." (D.I. 129, ex. A at MI568) The patentee made clear that the "items" and "associated discounts" were included in a database, i.e., "the independent claims concern discount offers in which items are tested relative to a database . . . ." (*Id.* at MI569) By contrast, the patentee described that the prior art gave "a discount if the item is in a department and not because of the item's or items' identity." (*Id.* at MI569)

**3. "[A]ssociating said identification code means with the addressee of the circulation medium and with data identifying items to be offered at a discount:"[4]**

"[O]ne or more identification codes referring to data files, including one file which lists more than one discount eligible item, and another file which contains identification information for the addressee." The specification supports this construction, explaining that the discount flyers may have one or more barcodes with associated data. A code "identifies an address in the memory means 14 which corresponds to a current discount circular. Amongst the identifying data associated with this address location would be (a) the items identified by inventory number to which a discount offer has been made . . . ." (6:32-38) Moreover, the code

> representing the brochure type is a machine readable code . . . and, optionally, could include the name and/or address of the person, household, business, or organization intended to receive the advertising. However, at the very least, the indicia must include a code which identifies the flyer so that the designated offers which are set forth on that flyer can be called up by the computer 8 when the flyer is presented at the point of

[4]Claim 17.

3

sale station.

(5:55-65)  A preferred embodiment of the flyer supplies "a bar code indicia 42 which identifies in machine readable code the brochure title" and "the indicia means 38 further includes a second barcode indicia 41 which is readable by the system 2 of the invention and which identifies the address of the user."  (5:30-38)

**4.  "[A]ddressable by said identification code:"**[5]  "[T]he data identifying items which are to be offered at a discount can be accessed through information found in the identification code."  The specification describes that the identification code "identifies an address in the memory means 14 which corresponds to a current discount circular." (6:33-35)  The maker of the flyer provides to the retail store "an updated file identifiable by a new code to be downloaded into the [point of sale ("POS")] machine," which file contains the products offered at a discount.  (6:19-31)

**5.  "[M]eans for reading said identification code provided with said circulation medium:"**[6]  This means-plus-function limitation has the function "reading an identification code"[7] and the structure "barcode scanner."  The specification discloses that the POS machines have "an associated scanning device 6,6 which is connected to each point of sale machine as a means for reading machine readable coding . . . ."  (4:47-53; fig. 1)

**6.  "[U]sing said code reading means to read the identification code indicia**

---

[5]Claim 1.

[6]Claims 1 and 17.

[7]Agreed on by the parties.

4

**means and to create a data file:"**[8]  "[T]he code reading means is used to read the indicia so that a data file may be created."   The specification describes that the scanning means is used to identify the memory address location representing the flyer, "the information contained in the identification indicia 41 is released from a buffer and downloaded to the customer reference memory 15 (Step 61) where this information will automatically serve to identify a file created under the name and/or address of the addressee." (7:14-29)

    **7. "[A]ny discount corresponding to an item listed in said data is deducted from the price of the item in the tabulation:"**[9]  "[A]ny (i.e., whichever) discount that is attributable to a particular item is deducted from the price of the item."  The specification describes that "[t]he data representing these items and their associated discounts are held in temporary memory such that the purchased items when checked at the point of sale terminal for quantity, size and amount can be automatically awarded a discount if appropriate." (7:59-63)

    **8. "[P]roviding as part of said identification code identification indicia means on said medium for identifying the addressee of said medium:"**[10]
"[M]achine readable code which refers to a file, which file contains identification information for the addressee."  The specification describes that the code "representing the brochure type is a machine readable code . . . and, optionally, could include the

---

[8]Claims 12 and 17.

[9]Claim 1.

[10]Claim 12.

5

name and/or address of the person, household, business, or organization intended to receive the advertising." (5:55-65)

**9. "[T]he user:"**[11] "[T]he person who uses the circulation medium, who may or may not be the addressee." The specification contemplates mailing the flyer to "the address of the user" and having "a holder" carry and use the flyer. (5:35-38, 6:48-52)

**10. "[U]sing each data file . . . as a means to study buying habits of the recipient of the medium:"** "[U]sing each data file as a way of studying buying habits." In the context of the claim language,[12] this limitation does not recite a function. Instead, it describes using data files to study buying habits. *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366 (Fed. Cir. 2008) ("A claim element that contains the word "means" and recites a function is presumed to be drafted in means-plus-function format under 35 U.S.C. § 112 ¶ 6.").

**11. The means plus function limitations.** Generally, "in a means-plus-function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'" *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (quoting *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999)). The specification can express the

---

[11]Claim 12.

[12]A method as defined in claim 12 further characterized by using each data file identified by said identification indicia means as a means to study buying habits of the recipient of the medium. (10:23-26)

6

algorithm "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (internal citation omitted).

The description of the algorithm must do more than describe the function to be performed; it must describe how the function is to be performed. *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382-83 (Fed. Cir. 2009) (finding "[t]he specification contains no description of the structure or the process that the access control manager uses to perform the 'assigning' function."). It is insufficient to aver that a disclosure has enough structure for a person of ordinary skill to devise some method or write some software to perform the desired function. *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013) (citing *Blackboard*, 574 F.3d at 1385).

In *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361 (Fed. Cir. 2012), the Federal Circuit explained that a narrow exception to the requirement for an algorithm exists.

> [A] general-purpose computer is sufficient structure if the function of a term such as 'means for processing' requires no more than merely 'processing,' which any general-purpose computer may do without any special programming. If special programming is required for a general-purpose computer to perform the corresponding claimed function, then the default rule requiring disclosure of an algorithm applies. It is only in the rare circumstances where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed.

*Id.* at 1364 (citing *In re Katz*, 639 F.3d 1303, 1316 (Fed. Cir. 2011)).

7

**a. "[M]eans associated with said code reading means for tabulating**

**sales of items so that any discount corresponding to an item listed in said data is**

**deducted from the price of the item in the tabulation:"**[13]  The recited function is

"tabulating sales of items so that any discount corresponding to an item listed in said

data is deducted from the price of the item in the tabulation." The structure is "a point

of sale machine ('POS') linked to a main computer."[14]  The specification describes that

a POS machine uses the indicia on the flyers "to identify items which are offered at a

discount and then apply an appropriate credit to the purchased items." (Abstract)

Moreover,

> [e]ach point of sale machine is linked to a main computer 8 which includes
> a controller 10 responsible for managing the data which is input to the
> system through the point of sale machines 4,4 as part of the normal
> transactions of the store. The point of sale machines are standard readily
> available machines each having a microcomputer unto themselves which
> is capable of communicating in real time with the main computer 8 of the
> network.

(4:53-61) The main computer includes memory used to store the "discount program

offered to the customer and identified by a particular code," "discounts on items against

manufacturers offers for subsequent credit by the appropriate manufacturer and/or

financial institution," and "the name or residence address of a purchaser and for

recording his or her transactions." (5:1-17) Therefore, in order to perform the specified

function, the POS machine accesses the memory stores of the main computer to

---

[13]Claim 1.

[14]Plaintiff argued that the structure is "the point of sale machine," which provides
adequate physical structure and avoids triggering the algorithm requirement of *WMS
Gaming* and its progeny. However, as discussed, this argument does not survive
scrutiny of the specification.

8

retrieve the discounts.

To the extent the specified function requires more than "the functions of 'processing,' 'receiving,' and 'storing,'" which could be performed by a general computer without special programming, the court looks to the specification for disclosure of an appropriate algorithm. *In re Katz*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (finding that "the functions of 'processing,' 'receiving,' and 'storing' are coextensive with the structure disclosed, i.e., a general purpose processor," and do not require disclosure of an algorithm). Figures 3A, 3B and 3C, along with the descriptions thereof, describe the process used to "tabulate," including storing the customer information, retrieving the stored discounts, and matching the purchased item with discounts (and either paying full price or debiting the discount). (Figs. 3A, 3B, and 3C, 8:7-21) This description is sufficient to provide the needed algorithm for the specified function.

**b. "[M]eans for tabulating items":**[15] The function is "tabulating items." As discussed above, the structure is "a point of sale machine ('POS') linked to a main computer." Moreover, the claim limitation of claim 12, "using said means for tabulating items," refers to the "means for tabulating items" limitation recited in claim 1.

**c. "[M]eans for tabulating items and for recording the items purchased by the bearer of the circulation medium:"**[16] The function is "tabulating items and recording items purchased by the bearer of the circulation medium." As discussed above, the structure is "a point of sale machine ('POS') linked to a main

---

[15]Claim 1 and 17.

[16]Claim 12.

9

computer."

**d. "[M]eans for calculating the at least one discount on the item offered at discount by said identification code means:"**[17]  The function is "calculating the at least one discount on the item offered at discount by said identification code means."  As discussed above, the structure is "a point of sale machine ('POS') linked to a main computer."

**12. Agreed upon constructions.**

**a. "[U]sing said means for tabulating items . . . to cause a discount to be debited against the purchased item:"**[18]  "[T]he tabulating means determines if a purchased item is discounted, and applies the discount to the item."

**b. "[T]he bearer of the circulation medium:"**[19]  "[T]he person who presents the circulation medium for a discount."

13.  The court has provided a construction in quotes for the claim limitations at issue. The parties are expected to present the claim construction to the jury consistently with any explanation or clarification herein provided by the court, even if such language is not included within the quotes.

IT IS FURTHER ORDERED that defendant's motion to strike plaintiff's late claim construction positions (D.I. 139) is denied for the following reasons.  Pursuant to the court's scheduling order, on July 30, 2013, defendant served a list of 23 claim

---

[17]Claim 17.

[18]Claim 1.

[19]Claim 17.

10

limitations requiring claim construction; on July 31, 2013, plaintiff served a list of five

claim limitations requiring construction.  (D.I. 139 at ex. 1 & 2)  Defendant's submission

expressly stated that it "reserve[d] the right to modify the foregoing as discovery is

ongoing, and in response to any of [p]laintiff's proposed terms for construction or

proposed constructions."  It is ironic that defendant now seeks to prevent plaintiff from

doing the same.  On December 3, 2013, the parties submitted the joint claim

construction chart, with defendant "object[ing] to [p]laintiff's proposed constructions that

it disclosed for the first time on the day before this Joint Chart was submitted and after

the close of fact and expert discovery."  (D.I. 129)

Claim construction is a matter of law and focuses on intrinsic evidence. *Phillips*,

415 F.3d at 1330; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.

1996); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en

banc), *aff'd*, 517 U.S. 370 (1996).  Therefore, the court will not strike "plaintiff's claim

construction positions," which consist of plaintiff's legal arguments presented in its

briefing regarding its proposed constructions.

United States District Judge